IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| SHERRIE D. HOLDSWORTH, individually and as Personal Representative for the Estate of KEVAN A. HOLDSWORTH, Deceased,<br><br>               Respondents,<br><br>v.<br><br>SCAPA WAYCROSS, INC.,<br><br>               Appellant,<br><br>3M COMPANY, f/k/a Minnesota Mining and Manufacturing Company; ALASKA COPPER COMPANIES, INC., a Washington corporation; ALBANY INTERNATIONAL CORPORATION; ASTENJOHNSON INC.; AW CHESTERTON COMPANY; CBS CORPORATION; a Delaware corporation, f/k/a VIACOM, INC., successor by merger to CBS CORPORATION, a Pennsylvania corporation, f/k/a WESTINGHOUSE ELECTRIC CORPORATION; CRANE CO.; EJ BARTELLS SETTLEMENT TRUST, a Washington corporation; GARDNER DENVER NASH LLC, individually and as successor in interest to NASH ENGINEERING COMPANY; GENERAL ELECTRIC COMPANY; GOULDS PUMPS, LLC; | No. 83564-5-I<br><br>DIVISION ONE<br><br>ORDER AMENDING OPINION |

HARDER MECHANICAL
CONTRACTORS;
INGERSOLL RAND COMPANY;
IMO INDUSTRIES, LLC, individually
and as successor in interest to
DELAVAL;
ITT CORPORATION, individually and
as successor in interest to ALLIS-
CHALMERS;
JOHN CRANE INC;
METROPOLITAN LIFE INSURANCE
COMPANY;
SULZER PUMPS (US), INC., f/k/a
SULZER BINGHAM PUMPS, INC.;
UNION CARBINE CORPORATION;
and
VIKING PUMP COMPANY,

     Defendants.

   The opinion for this case was filed on March 13, 2023. A majority of the panel requests that the opinion filed on March 13, 2023 be amended and the portion of the sentence on page 17 of the opinion be changed from "Defense expert Dr. Richard Kradin" to "Plaintiff's expert Dr. Richard Kradin."

   Now therefore, it is hereby

   ORDERED that the opinion filed on March 13, 2023 be amended.

       FOR THE COURT:

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| SHERRIE D. HOLDSWORTH, individually and as Personal Representative for the Estate of KEVAN A. HOLDSWORTH, Deceased, | No. 83564-5-I |
| Respondents, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| SCAPA WAYCROSS, INC., | |
| Appellant, | |
| 3M COMPANY, f/k/a Minnesota Mining and Manufacturing Company; ALASKA COPPER COMPANIES, INC., a Washington corporation; ALBANY INTERNATIONAL CORPORATION; ASTENJOHNSON INC.; AW CHESTERTON COMPANY; CBS CORPORATION; a Delaware corporation, f/k/a VIACOM, INC., successor by merger to CBS CORPORATION, a Pennsylvania corporation, f/k/a WESTINGHOUSE ELECTRIC CORPORATION; CRANE CO.; EJ BARTELLS SETTLEMENT TRUST, a Washington corporation; GARDNER DENVER NASH LLC, individually and as successor in interest to NASH ENGINEERING COMPANY; GENERAL ELECTRIC COMPANY; | |

GOULDS PUMPS, LLC;
HARDER MECHANICAL
CONTRACTORS;
INGERSOLL RAND COMPANY;
IMO INDUSTRIES, LLC, individually
and as successor in interest to
DELAVAL;
ITT CORPORATION, individually and
as successor in interest to ALLIS-
CHALMERS;
JOHN CRANE INC;
METROPOLITAN LIFE INSURANCE
COMPANY;
SULZER PUMPS (US), INC., f/k/a
SULZER BINGHAM PUMPS, INC.;
UNION CARBINE CORPORATION;
and
VIKING PUMP COMPANY,

Defendants.

HAZELRIGG, J. — Scapa Waycross, Inc. appeals a jury verdict awarding nearly $17 million to Kevan Holdsworth's estate and his surviving spouse. Scapa Waycross argues there was insufficient evidence to prove its products were a substantial factor in causing Holdsworth's mesothelioma and the trial court erred in denying its motions for judgment as a matter of law. Further, Scapa Waycross avers the trial court's curative instruction at the end of closing arguments was an improper comment on the evidence, requiring reversal. We disagree and affirm.

FACTS

From 1964 to 2001, Kevan Holdsworth worked at a paper mill[1] in Camas, Washington (Camas mill or the mill). During his 37-year career at the Camas mill, Holdsworth held multiple positions and was exposed to asbestos from several

---

[1] The mill was operated by Crown Zellerbach and is now run by Georgia-Pacific.

sources at the site. From 1969 to 1976, he worked on the paper machine cleanup crew. In that position, Holdsworth participated in the cleaning process, i.e., the "blow down," of every paper machine at the Camas mill. During that time period, Scapa Waycross (Scapa) supplied 238 dryer felts to the Camas mill and 141 of those felts contained asbestos. Dryer felts are absorbent materials that are used in paper machines to move wet sheets of paper through the drying end of the machine. Of the 14 paper machines at the Camas mill, 11 used Scapa's asbestos-containing dryer felts.



[2]

During a blow down, the cleanup crew used air hoses to blow the dust off the paper machines, from top to bottom, inside and out. After blowing down the tops of the machine hoods, they would go inside of a paper machine onto the dryer felts and blast the pressurized air onto the felts. Every three weeks, each machine

---

[2] Photograph of one of the paper machines at the Camas mill which was admitted at trial as Exhibit 2365.

had a scheduled blow down; the cleanup crew conducted two to three blow downs per week, which covered the workers in dust from both the felts and the machines. Beyond participating in blow downs, Holdsworth would also replace degraded dryer felts, a process which included cutting up the used felts.

From 1976 to 1988, Holdsworth worked in the maintenance department at the Camas mill. As part of his regular duties during this time, Holdsworth used a hammer to break off chunks of insulation from the pumps, which produced a large amount of dust. The insulation was known to contain asbestos. From 1988 to 1995, Holdsworth worked with the paint shop and would remove and replace insulation on various pipes. From 1995 to 2001, Holdsworth finished his career at the Camas mill in the pipe shop, where he worked with valves, pipes, gaskets, and packing materials.

In December 2018, Holdsworth was diagnosed with mesothelioma. Holdsworth and his wife, Sherrie,[3] sued Scapa and other asbestos manufacturers based on his exposure at the Camas mill. In 2019, Holdsworth passed away, and Sherrie filed an amended complaint asserting claims on her own behalf and as the representative of Holdsworth's estate. Scapa filed a motion for summary judgment that was denied, and the case proceeded to trial.

On May 20, 2021, the virtual jury trial commenced. Holdsworth's videotaped perpetuation deposition was played for the jury. Scapa moved for judgment as a matter of law under CR 50 at the close of Holdsworth's case-in-chief, which the court denied. Scapa then renewed it at the close of all evidence,

_____

[3] Because they share the same last name, we refer to Sherrie Holdsworth by her first name as needed for clarity. We intend no disrespect.

but the trial court again denied the motion. The jury was instructed on strict liability for defective design, strict liability for failure to warn, and negligence. During closing argument, Holdsworth objected to Scapa's statement to the jury relating to its consideration of damages and substantial factors. The trial court provided a curative instruction to the jury, to address the "gray" situation presented by Scapa's argument. Scapa objected to the instruction as given. After deliberation, the jury returned a verdict of $16,674,097.49 million in favor of Holdsworth's estate and Sherrie. Several months after the verdict, Scapa again renewed its motion for judgment as a matter of law and also moved for a new trial under CR 59; both motions were denied. Scapa timely appealed.

## ANALYSIS

### I. Substantial Evidence and Reasonable Inferences Under CR 50

Scapa assigns error to the trial court's denial of its motion for judgment as a matter of law, arguing there was insufficient evidence of both exposure and proximate cause. Scapa asserts Holdsworth's case was "based on speculation and should never have been allowed to proceed to a verdict." We disagree.

As a preliminary matter, "Courts are appropriately hesitant to take cases away from juries." H.B.H. v. State, 192 Wn.2d 154, 162, 429 P.3d 484 (2018). As our state constitution confers on juries the "ultimate power to weigh the evidence and determine the facts," there is a strong presumption that jury verdicts are correct. James v. Robeck, 79 Wn.2d 864, 869, 490 P.2d 878 (1971); Bunch v. King County Dep't of Youth Servs., 155 Wn.2d 165, 179, 116 P.3d 381 (2005).

We review the trial court's denial of a motion for judgment as a matter of law under the same standard as the trial court. Stiley v. Block, 130 Wn.2d 486, 504, 925 P.2d 194 (1996). A CR 50 motion for judgment as a matter of law may only be granted when, "after viewing the evidence in the light most favorable to the nonmoving party, there is no substantial evidence or reasonable inferences therefrom to support a verdict for the nonmoving party." H.B.H., 192 Wn.2d at 162. The court "must accept the truth of the nonmoving party's evidence and draw all favorable inferences that may reasonably be evinced." Lockwood v. A C & S, Inc., 109 Wn.2d 235, 243, 744 P.2d 605 (1987). Substantial evidence exists when it is "sufficient to persuade a fair-minded, rational person of the truth of the declared premise." Brown v. Superior Underwriters, 30 Wn. App. 303, 306, 632 P.2d 887 (1980). Rather than reweighing conflicting evidence, we "presume that the jury resolved every conflict and drew every reasonable inference in favor of the prevailing party." Coogan v. Borg-Warner Morse Tec Inc., 197 Wn.2d 790, 812-13, 490 P.3d 200 (2021). A jury verdict may only be overturned if it is "clearly unsupported by substantial evidence." Burnside v. Simpson Paper Co., 123 Wn.2d 93, 107-08, 864 P.2d 937 (1994).

A. Holdsworth's Exposure to Asbestos from Scapa's Dryer Felts

Traditional products liability theory requires a reasonable connection between the harm suffered by the plaintiff, the product that caused the harm, and the manufacturer of that product. Martin v. Abbott Lab'ys, 102 Wn.2d 581, 590, 689 P.2d 368 (1984). Accordingly, plaintiffs "must identify the particular manufacturer of the product that caused the injury." Lockwood, 109 Wn.2d at 245.

In asbestos cases, it is well settled that plaintiffs "may establish exposure to a defendant's product through direct or circumstantial evidence." Morgan v. Aurora Pump Co., 159 Wn. App. 724, 729, 248 P.3d 1052 (2011). To identify the defendant's asbestos-containing product to which they were exposed, plaintiffs may rely on witnesses whose testimony merely places the defendant's product at the workplace during the relevant time period. Lockwood, 109 Wn.2d at 247. No detailed recollection of circumstances surrounding the exposure to the asbestos-containing product is required. Morgan, 159 Wn. App. at 729. When exposure is based on circumstantial evidence, however, "'there must be reasonable inferences to establish the fact to be proved.'" Id. (quoting Arnold v. Sanstol, 43 Wn.2d 94, 99, 260 P.2d 327 (1953)).

From 1969 to 1976, Scapa supplied the Camas mill with 141 asbestos-containing dryer felts. Holdsworth and his coworker, Robert Crowson, both recalled seeing the name "Scapa" on the packaging of dryer felts at the Camas mill. During that time period, Holdsworth participated in blow downs on every paper machine at the mill, and 11 of the mill's 14 paper machines used Scapa's asbestos-containing dryer felts. This evidence alone is sufficient under Lockwood to establish Holdsworth's exposure to Scapa's asbestos-containing product at the Camas mill, and more than satisfies the substantial evidence or reasonable inferences standard under H.B.H. to survive a CR 50 challenge. However, Holdsworth presented even more detailed evidence to prove exposure to asbestos in Scapa's dryer felts.

The entire cleanup crew participated in two to three blow downs per week; each machine had scheduled blow downs every three weeks and additional unscheduled blow downs for maintenance. In general, each machine had three to six dryer felts distributed between the top and bottom sections of the machine. To blow down the top felts, the cleanup crew members would first get on structures above the machines, blowing dust from the top of the dryer section down to the operating room floor, and then get inside of the paper machines, standing directly on the dryer felts while blasting the felts with pressurized air. Once the top dryer felts were blown down, the crew would move to the bottom felts. At this stage, they would go to the basement with their blowpipes, walk directly onto the lower felts, and blast them with compressed air. Once all of the dust from a paper machine was driven to the basement, there would be about one- to two-and-a-half inches of dust beneath the dry section of the machine. The crew would then rake as much of the dust as they could into dust pans, vacuum any dust that remained, and blow any residue back towards the dryer section. As a result of the blow down process, the crew members would be covered in dust. According to Crowson, "if you didn't have three quarters of an inch of dust on you, it was a pretty light day for dust."

Crowson further testified that, while they worked together on the cleanup crew, Holdsworth participated in blow downs "100 percent of the time" and "blew every machine, every fabric, multi[ple] times." Another Camas mill worker specifically recalled Holdsworth conducting blow downs on paper machines 15 and 16, which ran a combined total of 31 of Scapa's asbestos-containing dryer felts

during the relevant period. Scapa's asbestos-containing felts ran on various paper machines at the mill for considerable time periods, some for 200 days, and others for 400 to 600 days. Notably, one ran for over three years; starting in August 1973, it ran for 1,163 days.

Scapa points to the lack of direct evidence that Holdsworth was actually exposed to asbestos from a Scapa dryer felt, noting that neither Holdsworth nor his coworkers could definitively testify to Holdsworth interacting with a known Scapa dryer felt. This is not the test under settled case law. See Lockwood, 109 Wn.2d at 247; see also Morgan, 159 Wn. App. at 729. While Scapa concedes that direct evidence is not required to establish exposure in asbestos cases, it argues that the circumstantial evidence here is insufficient to establish Holdsworth was exposed to Scapa's asbestos-containing felts. The record openly contradicts Scapa's contention.

Viewed in the light most favorable to Holdsworth, the record amply evinces his exposure to asbestos from Scapa's felts. Scapa supplied 141 asbestos-containing dryer felts to the Camas mill during the years Holdsworth worked on the cleanup crew.[4] Holdsworth testified that he participated in blow downs on every paper machine at the mill, and Crowson testified that Holdsworth "blew every machine, every fabric, multi[ple] times."[5] Nearly every paper machine at the

---

[4] Scapa argues that the jury could not reasonably assess the probability that Holdsworth was exposed to any of its 141 asbestos-containing felts without knowing the total number of felts at the Camas mill during this time period. Appellant's Reply Br. at 15. While such evidence may have helped to reach a more precise statistical likelihood of Holdsworth's exposure to Scapa's product, considering all the other evidence in the record, that figure was not necessary to establish a reasonable inference as to exposure. Scapa abandoned this position at oral argument.

[5] Scapa avers that Crowson's challenged testimony cannot be used to support a finding of exposure because it was inconsistent with Holdsworth's testimony, and was inadmissible lay speculation. Appellant's Reply Br. at 8-10. First, to support its claim that the evidence leads to

Camas mill used Scapa's asbestos-containing dryer felts. These felts ran on the various machines for many months to years at a time. Another worker at the mill specifically recalled Holdsworth conducting blow downs on two machines which ran a combined total of 31 of Scapa's asbestos-containing dryer felts, with one of those felts running for nearly half the time that Holdsworth was on the cleanup crew.[6]

Scapa boldly asserts that this evidence called for speculation and, as a result, the claims should never have been allowed to go to a jury. This position crumbles when considered under the proper legal standard; we need only conclude that it was either substantial evidence to meet the exposure element of Holdsworth's claims, or that reasonable inferences could be drawn therefrom for a jury to determine that the element had been satisfied. See Lockwood, 109 Wn.2d at 243; see also H.B.H., 192 Wn.2d at 162; see also Burnside, 123 Wn.2d at 107-

---

inconsistent inferences of exposure, Scapa compares Crowson's testimony that Holdsworth participated in every blow down and Holdsworth's testimony that he "didn't cover every down." Scapa's claim of inconsistency is misguided and fails to recognize that, overall, Crowson's challenged statement and Holdsworth's testimony both support the same reasonable inference: Holdsworth regularly participated in blow downs on all of the paper machines at the Camas mill, nearly all of which ran Scapa's asbestos-containing dryer felts. Further, any discrepancies in witness testimony are properly resolved by the jury as it makes credibility determinations and decides what weight to give the evidence presented.

Second, the trial court did not err in allowing Crowson's challenged testimony. Consistent with ER 701, Crowson's statement was a permissible inference based on his direct observations of Holdsworth during the relevant time period, and his personal knowledge of the blow down process at the Camas mill. Further, Crowson's testimony was not based on scientific, technical, or specialized knowledge that would call for particular expertise.

[6] Scapa again argues that without knowing the total number of felts used on machine 15, no ratio can be calculated, and without a ratio, the likelihood that Holdsworth encountered an asbestos-containing Scapa felt during a blowdown is "pure speculation." Appellant's Reply Br. at 14. Just because the exact ratio of felts is unknown does not mean an inference of exposure is purely speculative: 12 asbestos-containing Scapa felts ran on that machine and one ran for nearly half the time that Holdsworth was working on the cleanup crew. This is sufficient to support a reasonable inference that Holdsworth was exposed to Scapa's asbestos-containing felts during the relevant time period.

08; see also Allen v. Asbestos Corp., 138 Wn. App. 564, 573-74, 157 P.3d 406 (2007).

Holdsworth presented more than sufficient evidence from which a jury could decide that he was exposed to asbestos based on both his direct contact with Scapa's asbestos-containing dryer felts when he participated in blow downs and felt replacements, and, what one of his expert witnesses termed, "bystander exposure" when he was simply working in proximity to blow downs of machines running Scapa's asbestos-containing felts.

B.  Scapa Dryer Felts as a Substantial Factor of Holdsworth's Mesothelioma

To establish causation, plaintiffs bringing claims based on asbestos exposure must also show that the exposure proximately caused their injury. Mavroudis v. Pittsburgh-Corning Corp., 86 Wn. App. 22, 28, 935 P.2d 684 (1997). As there may be multiple proximate causes in an asbestos case, the plaintiff may establish causation against a defendant even if the plaintiff would have still contracted mesothelioma without exposure to that defendant's product. Id. at 28. For the relevant exposure to be deemed a proximate cause, plaintiffs need only show that it was a "substantial factor" in their contraction of mesothelioma. Id. at 30-31. "A substantial factor is an important or material factor and not one that is insignificant." Id. at 28.

In Lockwood, our Supreme Court noted that "because of the peculiar nature of asbestos products and the development of disease due to exposure to such products, it is extremely difficult to determine if exposure to a particular defendant's

asbestos product actually caused the plaintiff's injury." 109 Wn.2d at 248. Accordingly, the court provided a number of factors that should be considered:

> (1) plaintiff's proximity to the asbestos product when the exposure occurred and the expanse of the work site where asbestos fibers were released, (2) the extent of time the plaintiff was exposed to the product, and (3) the types of asbestos products to which plaintiff was exposed and the ways in which the products were handled and used.

Berry v. Crown Cork & Seal Co., 103 Wn. App. 312, 323-24, 14 P.3d 789 (2000) (outlining factors identified in Lockwood, 109 Wn.2d at 248). "Ultimately," the court explained, "the sufficiency of the evidence of causation will depend on the unique circumstances of each case." Lockwood, 109 Wn.2d at 249.

Scapa focuses on the second factor, which it deems "critical"[7] to our analysis: "the extent of time plaintiff was exposed to the product." Scapa contends that, because Holdsworth did not advance a "jobsite-drift theory," he was required to present specific evidence of his exposure to asbestos from Scapa's felts. Without such evidence, Scapa maintains the jury had no basis to evaluate the extent of time that Holdsworth was exposed and thus no basis to find that the exposure was a substantial factor to Holdsworth's mesothelioma. Again, this misconstrues the actual legal standard.

In Lockwood, our Supreme Court rejected many of the same arguments Scapa now presents. 109 Wn.2d at 245-46. Lockwood worked in various shipyards in the Puget Sound area, overhauling and repairing old vessels. Id. at 237-38. During this time, the defendant, Raymark, manufactured asbestos cloth

---

[7] Appellant's Br. at 41-42. Scapa claims the "principle" that this factor is "critical" is "embedded in our Supreme Court's causation jurisprudence." Id. at 42. However, Scapa provides no citation besides Lockwood, which only listed this factor as one that "should be considered" in determining whether there is sufficient evidence of causation. 109 Wn.2d at 248-49.

which was used on vessels in the Puget Sound region. Id. at 239. Though Lockwood never worked directly with the asbestos-containing materials, sometimes he would work in the same area of the vessel where insulation workers had removed and installed asbestos insulation. Id. at 238. As a result, Lockwood was exposed to asbestos. Id. at 238-39. Raymark argued there was insufficient evidence establishing that the exposure to its asbestos-containing cloth proximately caused Lockwood's disease because Lockwood: never directly interacted with any asbestos-containing cloth at work; did not participate in tearing asbestos cloth from any vessel he worked on, yet this was his primary source of exposure; presented no specific or direct evidence that the asbestos-containing cloth he was exposed to was made by Raymark; and could not personally identify Raymark's cloth as being present on any of the vessels he worked on. Id. at 245. On review, the court held the evidence was sufficient to support a finding of both exposure and proximate cause. Id. at 247-48.

Regarding exposure, the court based its determination on the testimony of one former insulator who recalled Raymark asbestos cloth was used on a large vessel that Lockwood also worked on at one point in his career, and "expert testimony that after asbestos dust was released, it drifted in the air and could be inhaled by bystanders who did not work directly with asbestos." Id. at 247. Concerning proximate cause, the court explained that the exposure to Raymark's cloth, in combination with "the expert testimony that all exposure to asbestos has a cumulative effect in contributing to the contraction of asbestosis," was sufficient

to support a reasonable inference that Raymark's cloth was a substantial factor in the injury. Id. at 247-48.

Again, Holdsworth's claims against Scapa are supported by even stronger evidence than that which the Supreme Court found sufficient in Lockwood. In an attempt to distinguish Lockwood, Scapa argues that Lockwood, unlike Holdsworth, pursued a "jobsite drift theory" of causation.[8] As there is no explicit reference to such a theory in the text of Lockwood or its progeny, and because Scapa fails to provide any citation to case law requiring an asbestos plaintiff to expressly raise such a theory, we will disregard the extensive portion of Scapa's briefing devoted to this defense, which was noticeably abandoned by counsel at oral argument.[9] Rather, this court will follow our Supreme Court's analysis in Lockwood and, under the CR 50 standard, consider whether the evidence viewed in the light most favorable to Holdsworth supports a reasonable inference that his exposure to Scapa's asbestos-containing dryer felts constituted a substantial contributing factor to his mesothelioma.

First, as established in the previous section, there is no question that Scapa's asbestos-containing dryer felts were used at the Camas mill while Holdsworth worked on the cleanup crew, resulting in his exposure to asbestos in

---

[8] Scapa asserts in briefing that the "critical fact" that distinguishes Lockwood, Allen, Berry, and Morgan, from this case is that "the plaintiffs in those cases pursued a 'jobsite drift' theory of causation." Appellant's Br. at 46-48. "Here," Scapa maintains, "Plaintiff did not advance a jobsite-drift theory" and "[t]hat deficiency is devastating to Plaintiff's case." Appellant's Br. at 47-48.

[9] At oral argument, Scapa did not address its argument pertaining to Holdsworth's failure to pursue a "jobsite drift theory" of causation. Notably, when directly asked during rebuttal argument whether this court needed to consider the claims regarding Holdsworth's failure to plead a jobsite drift theory, Scapa ultimately did not respond. Wash. Court of Appeals oral argument, Holdsworth v. Scapa Waycross Inc., No. 83564-5-I (Jan. 19, 2023), at 27 min., 40 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2023011205/?eventID=2023011205.

Scapa products. Both Holdsworth and Crowson recalled seeing "Scapa" on the packaging of dryer felts, and the parties stipulated that Scapa's asbestos-containing dryer felts ran on nearly every machine in the mill during the timeframe when Holdsworth worked on the cleanup crew. Further, Holdsworth regularly performed blow downs on every machine in the mill during this period, including a machine which ran one of Scapa's asbestos-containing felts for over three years. Accordingly, there is a reasonable inference that Holdsworth worked directly with Scapa's asbestos-containing dryer felts. Such direct exposure may have occurred when Holdsworth personally conducted blow downs on the machines, raked up and disposed of the dust created by the blow downs, or cut up and replaced dryer felts. Thus, unlike Lockwood, who never directly interacted with Raymark's cloth, the same cannot be said of Holdsworth regarding Scapa's asbestos-containing product.

Second, the expert testimony in Lockwood explained the ability of asbestos fibers to travel in the air and the risk of subsequent inhalation by bystanders; nearly identical testimony was provided here. Dr. Carl Brodkin, who specializes in occupational and environmental medicine, testified that there was potential "bystander exposure"[10] from various materials at the Camas mill explaining, "of course they could include dryer felts from the crew [Holdsworth] worked on." Explaining the "aerodynamics of asbestos fibers" in terms of bystander exposure, Brodkin testified:

> Fibers that become airborne certainly can travel and — and workers
> in a 25-foot radius or sometimes even a 50- or 75-foot radius can

---

[10] Brodkin testified that, "A bystander exposure is when a worker is not doing the activity, but may be in proximity to another worker performing an activity that disrupts the asbestos source."

inhale those fibers. That's most typical on — on crews for which a worker would be a member, where he would be a bystander or she would be a bystander to other crew members.

When asked whether bystander exposure would apply to a situation in which Holdsworth was within "25 feet" of another employee who was "break[ing] off amosite-containing pipe-covering insulation," Brodkin answered: "Yes. I think that would be a similar situation that we talked about yesterday, to where Mr. Holdsworth would be in proximity to another paper machine clean-up crew member doing a blow[]down, a similar situation." Christopher DePasquale, an industrial hygienist, also explained the aerodynamics of asbestos fibers, testifying that they are similar to a "feather," in that, "When it drops from a height, you might imagine it kind of floating down, and they're very small, so it takes a good bit of time for them to settle out of the air." Thus, he continued, "it presents the opportunity for asbestos to remain in the breathing zone for some time after it's disturbed."

Accordingly, not only does the evidence lead to a reasonable inference that Holdsworth was directly exposed to Scapa's asbestos-containing felts, but expert testimony also established that Holdsworth was further exposed to asbestos from Scapa's products even when he was not working specifically with them.

Third, as in Lockwood, there was expert testimony that the exposure to asbestos from Scapa's dryer felts was a substantial factor in the development of Holdsworth's mesothelioma.[11] Brodkin testified that Holdsworth's mesothelioma

---

[11] Scapa argues that this expert testimony is insufficient to establish that exposure to Scapa's dryer felts specifically was a substantial factor because both experts based their assessments on asbestos-containing felts generally. Appellant's Br. at 42-48. Scapa is incorrect. Not only does Scapa mischaracterize the holding of Lockwood, but it fails to recognize that this court views the evidence in the light most favorable to Holdsworth. The expert testimony is sufficient to support a reasonable inference that Holdsworth's exposure to Scapa's asbestos-

was causally related to asbestos exposure as a member of the cleanup crew from 1969 to 1976, "related to asbestos-containing dryer felts during the blow[] down and cutting." Holdsworth's counsel asked Brodkin to clarify his findings:

> Q. So to make sure I have followed, was Mr. Holdsworth's exposure to asbestos-containing dryer felts, including Scapa's asbestos-containing dryer felts, a substantial contributing factor towards Mr. Holdsworth's development of mesothelioma?
>
> A. Yes, it was a significant component part of Mr. Holdsworth's cumulative exposure to asbestos, and, as such, was a substantial contributing factor in his development of mesothelioma.

Brodkin further testified regarding the intensity of exposure during blow downs, which generate asbestos exposure from "tens of thousands of times, to over 20 million times ambient levels." Although Brodkin characterized Holdsworth's level of exposure as high, based on blow downs and cutting felts, he also confirmed that low levels of exposure can be sufficient to cause mesothelioma stating, "low level brief exposures are certainly attributable in terms of attributing diagnosis of mesothelioma." Defense expert Dr. Richard Kradin, trained as both a pulmonologist and pathologist, also testified that even low-level exposure to chrysotile asbestos fibers "increase[s] the risk of developing disease." Kradin explained "all occupational exposures that would release asbestos into the air that [Holdsworth] breathed" were substantial exposures that increased his risk of developing mesothelioma.

At oral argument before this court, and in additional authorities submitted later, Scapa repeatedly asserted that Holdsworth needed to present expert

---

containing dryer felts in use at the Camas mill during the time he was on the cleanup crew was a substantial factor in his contraction of mesothelioma.

medical testimony definitively stating that asbestos from Scapa's product caused his disease.[12] Yet again, this is simply not the law. Our Supreme Court expressly held in Lockwood that evidence of the exposure to the defendant's product, in combination with "the expert testimony that all exposure to asbestos has a cumulative effect in contributing to the contraction of asbestosis," was sufficient to support a reasonable inference that the product was a substantial factor in the disease. 109 Wn.2d at 247-48 (emphasis added).

While Scapa selectively presents excerpts of Brodkin's testimony as proof of purported evidentiary deficiencies and presents examples of how he could have testified more precisely, it ignores not only the other opinions Brodkin provided that do make the requisite causal connection, but also the entirety of the testimony from experts Kradin and DePasquale that reiterated and expanded on Brodkin's conclusions. Viewed in the light most favorable to Holdsworth, the evidence clearly supports a reasonable inference that the exposure to Scapa's dryer felts was a substantial factor in Holdsworth's contraction of mesothelioma. Wresting a verdict from the hands of a jury is an extreme remedy and may only be applied where that verdict is "clearly unsupported by substantial evidence." Burnside, 123 Wn.2d at 107-08. Because Holdsworth met the evidentiary standard under H.B.H. and

---

[12] This argument is unpersuasive in light of Scapa's express concession in its reply brief on this issue: "Scapa does not dispute that the asbestos to which Holdsworth was exposed at the Camas Mill medically caused his disease." Appellant's Reply Br. at 25. As explained in section A, Scapa's asbestos-containing dryer felts were among those products to which it concedes Holdsworth was exposed and were the medical cause of his mesothelioma.

Further, we are unmoved by the additional authorities Scapa submitted after argument on this theory because, as detailed in this section, expert medical testimony on causation was in fact provided to the jury.

Lockwood to survive Scapa's CR 50 motion for judgment as a matter of law, the trial court did not err in denying it and we will not disturb the jury's verdict.

II.     Curative Instruction in Response to Improper Closing Argument

Scapa avers the "trial court made an improper, unconstitutional, and prejudicial" comment on the evidence," that "effectively instructed the jury to disregard Scapa's causation defense."   Holdsworth responds that the issue is neither reviewable, as Scapa failed to timely object, nor one requiring reversal, as Scapa invited the error.   Alternately, Holdsworth contends that even if the instruction was an improper comment on the evidence, the unchallenged jury instructions cured any prejudice.

Our state constitution provides: "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." WASH. CONST. art. IV, § 16.  The purpose of prohibiting judges from commenting on the evidence is to "prevent the jury from being influenced by the trial judge's opinion of the evidence submitted."   State v. Hansen, 46 Wn. App. 292, 300, 730 P.2d 706 (1986), aff'd as modified by, 737 P.2d 670 (1987).  As a comment on the evidence violates a constitutional prohibition, a party may raise the issue for the first time on appeal.  State v. Lampshire, 74 Wn.2d 888, 893, 447 P.2d 727 (1968).

A trial judge's statement will qualify as a comment on the evidence "only if the court's attitude toward the merits of the case or the court's evaluation relative to a disputed issue is inferable from the statement."  Hansen, 46 Wn. App. at 300 (emphasis in original).  Scapa argues that the curative instruction here constituted

a comment on the evidence based on the latter.  At the end of its closing argument,

Scapa made the following statement:

> The other thing I would point out to you is consider the evidence. There were some big numbers thrown around. The money being sought here doesn't fit the law. Consider all of the evidence. There is nothing here that supports those numbers. So, again, we would ask you to find for Scapa and check "no" to questions one, three, and five.
>
> But if you believe — but if you believe that Scapa was a substantial contributing factor, plaintiffs' experts have conceded that there are many others who aren't here with us at trial who could be considered substantial contributing factors.

As Scapa made these concluding comments, it showed the jury a slide containing

a chart of the 21 other identified manufacturers of asbestos products present at

the Camas mill.  Once the jury was excused, Holdsworth objected and requested

a Koker[13] instruction.  Holdsworth asserted that Scapa had argued for a discount

based on the presence of asbestos-containing products of other manufacturers at

the Camas mill, which is contrary to Washington law on joint and several liability in

asbestos cases.[14]  Accordingly, Holdsworth argued that the Koker instruction

"ha[d] to be given" because Scapa was "trying to backdoor a reduced verdict" with

an improper argument.  Scapa responded that it referenced the "many others who

aren't here" in the context of substantial factor causation and was not attempting

---

[13] Koker v. Armstrong Cork, Inc., 60 Wn. App. 466, 484, 804 P.2d 659 (1991).  Holdsworth proposed a jury instruction nearly identical to challenged "Instruction 18" from Koker.  Id. Holdsworth's "Proposed Instruction No. 9" provided the following: "You have heard testimony about asbestos-containing products manufactured and sold by companies who are not defendants in this case.  If you find for the plaintiff, you are to award the plaintiff full damages, and you are not to speculate as to the method or effect, if any, of allocation of responsibility between the defendant and other parties or entities outside the context of this trial.  The [c]ourt will make any appropriate adjustment after trial."

[14] In asbestos cases, each defendant may be held jointly and severally liable for the full amount of damages suffered by the plaintiff.  RCW 4.22.030, .070(3).

to allude to any sort of damage reduction argument, despite the fact that the challenged language immediately followed a direct reference to the damages sought by Holdsworth.

Ultimately, the court denied Holdsworth's request for the Koker instruction, finding Scapa's statement to be "gray," rather than improper. However, the court noted that "the way it was phrased d[id] seem to be a suggestion to the jury that: 'Hey if — even if we're responsible as a substantial contributing factor, so are all these other folks [on the chart].'" To address the situation, the court told the parties that it was going to instruct the jury to disregard Scapa's last statement: "I'm going to remind the jury that the lawyers' remarks and statements are not evidence and to disregard the last statement regarding substantial contributing factors and others as they consider any — any potential damages." (Emphasis added.)

The record suggests that the parties accepted this proposed instruction. When the jury returned, the court provided the following instruction:

> Before I turn it over to [Holdsworth] for rebuttal; one thing I want you to know, as I've told you in the written instructions, that the lawyers' remarks and statements are not evidence. The evidence are those exhibits that I have admitted into the case and the testimony of witnesses. You are to disregard any statements or remarks by the lawyers that are inconsistent with the evidence or inconsistent with the law as I've given it to you. There was a statement regarding substantial contributing factor and whether other — if Scapa was a substantial contributing factor and other entities at the — at the mill were substantial contributing factors. You're to disregard that statement.

After Holdsworth presented rebuttal closing argument, the court thanked and excused the jury; deliberations were set to begin the following morning. Just after

the jurors signed off of the remote platform for the day, Scapa raised its concern about the court's curative instruction:

> Scapa disagreed for rebuttal closing argument, and the language that was used was slightly different than what was indicated before we went on the record. It was not couched in the context of damages, and I fear that it could be — potentially be misleading that the jury was instructed to disregard substantial factor causation.

Rather than requesting any specific recourse, Scapa simply stated, "I just want to get that objection on the record."  The court noted the objection.

Relying on In re Adoption of M.S.M.-P., Holdsworth first argues that this court need not address this issue because Scapa failed to timely object to the curative instruction.  184 Wn.2d 496, 358 P.3d 1163 (2015).  However, the assertion regarding timeliness is contradicted by the record, which clearly shows Scapa objected before deliberations began.  The court had an opportunity to cure any error, therefore the objection was timely.

Holdsworth next argues that Scapa invited the error.  "Under the invited error doctrine, a party may not set up an error at trial and then complain of it on appeal."  Lavigne v. Chase, Haskell, Hayes & Kalamon, P.S., 112 Wn. App. 677, 681, 50 P.3d 306 (2002).  It applies when "a party takes an affirmative and voluntary action that induces the trial court to take an action that a party later challenges on appeal."  Casper v. Esteb Enterprises, Inc., 119 Wn. App. 759, 771, 82 P.3d 1223 (2004) (citing Lavigne, 112 Wn. App. at 681).  Relying on Casper, Holdsworth contends that Scapa cannot challenge the trial court's instruction because Scapa's comments in closing argument induced the trial court's action.  119 Wn. App. 759.

In Casper, a corporate defendant refused to provide certain answers in its CR 30(b)(6) deposition besides "don't know," and the trial court sanctioned the defendant by binding it to those responses at trial. Id. at 764-66. However, during trial, the corporate representative repeatedly attempted to violate the court's order restricting testimony. Id. at 765-66. Accordingly, when the representative was asked a question covered by the order, the trial court would say "don't know" or "correct" for the defendant. Id. The corporation appealed, arguing that the trial court's statements violated the constitutional prohibition against judicial comments on the evidence. Id. at 770. Division Two of this court noted that the court's statements likely did constitute comments on the evidence in respect to the judge's attitude towards the corporate representative's credibility, but held that the witness invited the error. Id. at 771. Unlike the defendant in Casper, Scapa did not violate a court order, let alone repeatedly, to the point that the trial court had no choice but to comment on the evidence in a way that conveyed its attitude about Scapa's credibility. Although Holdsworth contends that Scapa intended to make an improper argument to the jury, and the argument contrary to law coupled with the slide containing the names of all 21 other manufacturers involved in the case is less "gray" to this panel than it was to the trial court, Scapa's statements did not rise to the level of inviting the alleged error. Accordingly, we will reach the merits on this issue.

When Scapa raised this argument in its CR 59 motion for a new trial, the judge explained the following: "I told the jury to disregard a statement, and it was a statement that [Scapa] had just made, literally, just a few minutes before I sent

the jury out. There can be no confusion. I mean, there would be no confusion by the jury to which statement I was referring." The trial court further noted that, while it told the jury to disregard arguments by the parties that were inconsistent with the law, it never told them to disregard other jury instructions with respect to proximate cause.

Although the curative instruction concerned "a statement" and told the jury to "disregard that statement" without limiting it to the consideration of damages as it had proposed to the parties, Scapa argues that "when read as a whole, the instruction directed the jury to disregard all statements about substantial contributing factors." Scapa points to the jury's inquiry during deliberations as showing that the court's statement was understood by the jury in such a way:

> Can any clarification be made on how damages are handled? Our understanding is that we are to come up with 2 numbers: damages to Kevin [sic] (the estate) and damages to Sherrie.

> Is it the case that the amount should be the total damage inflicted by Kevin's [sic] disease, not the portion that we believe Scapa to be responsible for and that determining the amount from that which Scapa would be responsible for is a separate process?

Contrary to Scapa's speculation, this inquiry from the jury does not lead to such an inference. Although it may show that the trial court's curative instruction was less effective than intended, it does not suggest an inference that the jury disregarded Scapa's entire defense theory concerning substantial factors.

Scapa relies on State v. Levy, which is distinguishable. 156 Wn.2d 709, 714, 132 P.3d 1076 (2006). There, Levy sought reversal of various criminal convictions on the ground that multiple jury instructions constituted judicial comments on the evidence. Id. at 714. The jury instructions for burglary in the

first degree referenced that the apartment complex in question was a "building," and a crowbar was a "deadly weapon." Id. at 716. These were both questions of fact for the jury to decide. Id. at 721-22. Accordingly, as the instructions conveyed to the jury that these issues of fact had been established as a matter of law, the court held that this language in the instructions constituted comments on the evidence. Id. at 721.

Here, unlike in Levy, the trial court did not instruct the jury on any question of fact as if it were settled as a matter of law. Rather, the trial court told the jury to disregard one statement, "regarding substantial contributing factor and whether other — if Scapa was a substantial contributing factor and other entities at the — at the mill were substantial contributing factors. You're to disregard that statement." Far from taking an essential element away from the jury, the trial court here took one errant statement away from Scapa's closing argument, which the trial court had already properly noted was "not evidence" and, when considered in context, arguably contradicted the law on joint and several liability in asbestos cases.

Holdsworth relies on Hizey v. Carpenter in arguing the trial court's statement did not constitute a comment on the evidence. 119 Wn.2d 251, 830 P.2d 646 (1992). After Hizey finished closing argument, but before the jury was discharged, the trial court said, "proximate cause as [Carpenter] said, is a difficult area of the law, it's an independent and intervening cause and there it is." Id. at 270. On review, our Supreme Court determined this was not a comment on the evidence. Id. at 271. First, the court noted that the trial judge "declared simply that proximate cause is 'difficult,' not 'difficult to find in this case.'" Id. Second, the court explained

the statement was "directed to counsel's arguments, which the jury was duly instructed are not evidence." Id. (emphasis omitted). Third, the court noted "jury instruction 1," in which the jury was informed that the law prohibits the trial court from commenting on the evidence and that any such comment must be disregarded. Id. The court concluded that, even if the trial court's comments were improper, the jury instruction to disregard them cured any error. Id. Here, as in Hizey, the attempted curative instruction was directed at a statement in closing argument, which the jury was instructed was not evidence, and the written instructions told the jury to entirely disregard any judicial comment on the evidence. Scapa attempts to distinguish Hizey on the grounds that the instruction there was not issue specific and had no potential effect of eliminating a disputed issue. However, Scapa fails to recognize that the challenged instruction here also did not have the potential effect of eliminating a disputed issue, despite Scapa's argument to the contrary.

Even assuming, without so deciding, that the trial court's statement constituted an improper comment on the evidence, any such error was harmless. In our analysis of improper judicial comments, the "fundamental question" is "whether the mere mention of a fact in an instruction conveys the idea that the fact has been accepted by the court as true." Levy, 156 Wn.2d at 726. "A judicial comment is presumed prejudicial and is only not prejudicial if the record affirmatively shows no prejudice could have resulted." Id. at 725. However, we also presume that the jury follows the instructions of the trial court. Bordynoski v. Bergner, 97 Wn.2d 335, 342, 644 P.2d 1173 (1982). Accordingly, even when a

trial court makes an improper comment, the error may be cured by a jury instruction to disregard any comments on the evidence. Hizey, 119 Wn.2d at 271.

Here, written "Instruction No. 1" expressly told the jury to disregard such comments:

> The law does not permit me to comment on the evidence in any way. I would be commenting on the evidence if I indicated my personal opinion about the value of testimony or other evidence. Although I have not intentionally done so, if it appears to you that I have indicated my personal opinion, either during trial or in giving these instructions, you must disregard it entirely.

Scapa's attempt to stretch an inference that the court's curative instruction—to disregard one statement which appeared to have been addressing consideration of damages—could have led the jury to disregard Scapa's entire defense theory of causation is plainly unrealistic. No reasonable person could conclude that the trial court was telling the jury that the crucial issue of causation had been decided as a matter of law. However, even assuming such an interpretation was initially possible, the court's written jury instructions cured any prejudice. As the trial court noted in its denial of Scapa's CR 59 motion for a new trial, the jury was only told to disregard one statement made by Scapa at closing argument; the jury was never told to disregard the written jury instructions it was provided concerning proximate cause. Those instructions were precisely the explicit legal framework which allowed Scapa to argue its theory of the case. Consistent with the directive set out in article IV, section 16 of our state constitution, the judge declared the law by providing proper, and unchallenged, instructions as to the role of the jury as the sole trier of fact, to disregard any statements by the judge it may perceive as comments on the evidence, and that set out the element of proximate cause as a

means of determining Scapa's liability.  Because we presume jurors will follow the instructions of the court, any purported error here would have been cured by the other instructions provided, as occurred in Hizey.

Holdsworth presented sufficient evidence to prove his exposure to asbestos from Scapa's asbestos-containing dryer felts and that the exposure was a substantial factor to his development of mesothelioma, by way of both lay and expert testimony.  Even without relying upon reasonable inferences in Holdsworth's favor, this was substantial evidence to support the jury's verdict and we decline to disturb it.  Further, Scapa has failed to demonstrate that the challenged curative instruction resulted in prejudice that was not remedied by the other instructions provided by the court.  Accordingly, the trial court did not err in denying Scapa's motion for judgment as a matter of law or its motion for a new trial.

Affirmed.

WE CONCUR:

Smith, A.C.J.                    Mann, J.